**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHEET METAL WORKERS LOCAL 22 PENSION, WELFARE, ANNUITY, EDUCATION, TRAINING AND INDUSTRY FUNDS, in its own right and by and through its TRUSTEES, by and through THOMAS GALLAGHER as Administrator, Trustee and Fiduciary, | Civil Action No.: 07-4576 (JLL) |
|           Plaintiffs, | |
| v. | **OPINION** |
| RICHARD JOSEPH VALENTI, et al., | |
|           Defendants. | |

**LINARES**, District Judge.

## INTRODUCTION

This matter arises out of allegations of outstanding pension plan withdrawal liability and benefit contribution arrearages by a pension fund against the president and sole shareholder of the company and his wife. Currently before the Court is a motion for summary judgment filed by Plaintiffs. The Court has considered the submissions made in support of and in opposition to the instant motion.[1] No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Plaintiffs' motion is granted in part and denied in part.

---

[1] This Court's jurisdiction is premised on 29 U.S.C. § 1132.

1

## LEGAL STANDARD

A court shall grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inferences drawn from them in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## DISCUSSION

### I.      Background

The following relevant facts are undisputed unless noted otherwise.[2]

---

[2] Local Civil Rule 56.1(a) provides, in pertinent part, the following:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

L. Civ. R. 56.1.  The Valenti Defendants have failed to provide a proper responsive statement of material facts.  Local Civil Rule 56.1(a) makes clear that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." Nevertheless, because of

<u>Plaintiffs</u>

Plaintiffs Sheet Metal Workers Local 22 Pension, Welfare, Annuity, Education, Training and Industry Funds (hereinafter Plaintiff or the "Funds") administer certain employee benefit plans for members of the Sheet Metal Workers Local 22 ("Local 22"). (Pl. 56.1 Stmt., ¶ 1). The Funds are a Taft-Harley trust fund established and maintained for the purpose of providing retirement and other related health and welfare benefits to eligible participants and beneficiaries pursuant to 29 U.S.C. § 186(c)(5). (<u>Id.</u>, ¶ 2). The Funds are an "employee benefit plan" within Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), with a principal place of business in Cranford, NJ. (<u>Id.</u>, ¶¶ 6, 8). The Trustees are the plan sponsor of Sheet Metal Workers Local 22 Pension, Welfare, Annuity, Education, Training and Industry Funds Plan (the "Plan"), a multiemployer plan within the meaning of 29 U.S.C. § 1002(37). (<u>Id.</u>, ¶ 3). The Plan is an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2) and (3) and a defined benefit plan within the meaning of 29 U.S.C. § 1002(35). (<u>Id.</u>, ¶ 4).

<u>Defendants</u>

Valairco, Inc. ("Valairco"), incorporated in the State of Delaware in 1968, is engaged in the business of installation and servicing of heat and air conditioning equipment. (<u>Id.</u>, ¶¶ 14, 15). From 1968 through at least 2006, Defendant Richard Valenti was the President and sole shareholder of Valairco. (<u>Id.</u>, ¶¶ 12, 13). Richard's wife and co-Defendant, Katherine Valenti, served as director of Valairco in 1996 and as Secretary and Treasurer until November 2006. (<u>Id.</u>, ¶¶ 120, 121, 139).

_____

Defendants' <u>pro se</u> status, the Court has carefully reviewed the papers they submitted to identify the facts which they contest.

The Valenti Defendants maintain that Katherine Valenti's capacity as officer of the company was for "ceremonial purposes only" and that she never had any decision-making authority. (Def. Opp'n, ¶ 3).

Since 1982, Valairco has maintained its principal place of business at 29 King Road in Green Brook, New Jersey. (Pl. 56.1 Stmt., ¶ 16). Prior to December 2006, Valairco also maintained a business operations at 1013 Kennedy Boulevard in Manville, New Jersey. (Id., ¶ 17). Since January 2007, Valairco's principal place of business has been the Manville property. (Id.).

Throughout the years, Valairco has employed members of Local 22 as union laborers in its heating and air conditioning business. In connection with this employment, Valairco and Local 22 were parties to a series of collective bargaining agreements. (Id., ¶¶ 20, 21). The operative collective bargaining agreement is hereinafter referred to as the "Collective Bargaining Agreement" or "CBA." The CBA required Valairco to make specific contributions to the Funds on behalf of all workers for performing certain work which fell within the scope of the CBA. (Id., ¶ 25). At some point prior to April 14, 2005, Valairco failed to make its weekly contributions for a period of over 30 days and likewise failed to submit monthly reconciliation reports. (Id., ¶ 31). As a result, Local 22 withdrew its members from Valairco's employ and engaged in a strike. (Id.).

<u>The 1996 Agreement</u>

In 1996, Norris, McLaughlin & Marcus, PA (hereinafter the "Norris Firm"), serving as legal counsel to Valairco, prepared an agreement (hereinafter referred to as the "1996 Agreement") for the restructuring of Valairco's business operations so as to improve its cash flow, profitability, operational efficiency and net worth. (Id., ¶¶ 50, 51). Pursuant to the 1996 Agreement, Richard and Katherine Valenti contributed the Green Brook property to Valairco as a capital contribution subject

4

to mortgage on same with Midlantic Bank. (Id., ¶ 56). Tax returns filed by Valairco for the period between 1995 through 2006 reflect Valairco's legal and equitable ownership of the Green Brook property. (Id., ¶ 59). Tax returns filed by Richard and Katherine Valenti personally for the period between 1997 and 2006 do not reflect personal ownership of the Green Brook property. (Id., ¶ 61).

Valairco's Bankruptcies

On or about October 8, 1980, Valairco filed for Chapter 11 Bankruptcy. (Id., ¶ 32). The 1980 Chapter 11 was closed and terminated in June 1991. (Id., ¶ 33). Valairco filed for Chapter 11 Bankruptcy again on April 14, 2005, scheduling Local 22 with a non-contingent, liquidated, undisputed, unsecured claim of $952,664.07. (Id., ¶¶ 34, 35).  The Funds filed a timely Proof of Claim in the 2005 Valairco bankruptcy proceeding, asserting an unsecured priority claim in the amount of $93,679.56 and setting forth a general unsecured claim in the amount of $950,933.40 arising from pre-petition contribution arrears. (Id., ¶ 36).  After performing an analysis in December 2005, the Funds determined that Valairco's proportionate share of withdrawal liability was $393,136.44. (Id., ¶¶ 38, 39). Following negotiations and motion practice, the Bankruptcy Court entered an Order dated December 4, 2006 granting the Funds' a general unsecured claim for Withdrawal Liability in the amount of $393,136.44 and a general unsecured claim for contribution arrears of $950,933.40, and scheduled an evidentiary hearing as to the disputed amount of the $93,679.56 priority claim of the Funds. (Id., ¶¶ 41-43).  By way of consent order, in lieu of an evidentiary hearing, the Funds' priority claim was fixed at $71,405.00. (Id., ¶ 46).

On December 4, 2006, the Bankruptcy Court confirmed Valairco's Fifth Amended Plan of Reorganization. (Id., ¶¶ 45, 70). Under the Confirmed Plan, Richard and Katherine Valenti voluntarily conveyed their Green Brook property to Valairco as "new value" to the debtor so as to

5

maintain Richard Valenti's equity in Valairco post bankruptcy.  (Id., ¶¶ 47, 71).  The proceeds from the sale of same were used in part to fund the reorganization plan and distributions to creditors. (Id.). Under its confirmed Fifth Amended Plan of Reorganization, the Funds ultimately received the following pro-rata payments from Valairco: (1) $71,405.00 on an arrearage priority claim, (2) $71,529.69 on an arrearage general unsecured contribution claim, and (3) $28,571.82 on a general unsecured withdrawal liability claim.  (Id., ¶ 48).  The following amounts remain outstanding: (1) $879,403.70 on contribution claim arrearages, and (2) $363,564.52 on withdrawal liability deficiencies. (Id., ¶ 49).

Real Estate Transactions

Between September 1, 2006 and January 31, 2007, the Norris Firm, serving as legal counsel to the Chapter 11 debtor Valairco, took steps culminating in a series of transactions which transferred title for various properties owned by Richard Valenti to Katherine Valenti, with Richard Valenti remaining liable for all mortgages and other liens. (Id., ¶ 77).  These properties included the Summit NJ property, the Manville NJ property, and the Blooming Grove PA property. (Id.).  The Real Estate Transfer Agreement ("RETA") which embodied these transactions states that the transfers set forth therein were for "good and valuable consideration." (Id., ¶ 79).  Consideration in the amount of $10.00 was ultimately given for each of the foregoing transfers. (Id., ¶¶ 92, 100, 108). The RETA also states that Katherine Valenti would contribute her interest in the Green Brook property to Richard Valenti to allow Richard to fund the Valairco Chapter 11 Plan, conditioned upon the transfer of reasonably equivalent consideration by Richard to Katherine. (Id., ¶ 80). In addition, the RETA states that Valairco would lease the Manville property from Katherine Valenti. (Id., ¶ 81).

Plaintiffs now seek summary judgment on their claims of withdrawal liability, contribution arrearages and fraudulent conveyance.  In particular, Plaintiffs seek to hold Richard and Katherine Valenti personally and jointly and severally liable for the withdrawal liability incurred by Valairco under the theory that they are members of a common control group with Valairco.  Plaintiffs also seek to "pierce the corporate veil" in order to hold Richard and Katherine Valenti personally and jointly and severally liable for Valairco's Plan contribution arrearages.  Lastly, Plaintiffs seek to avoid certain transfers of real property from Richard Valenti to Katherine Valenti on the basis that said transfers were made with the intent to hinder, delay or defraud Valairco's creditors.

## II.   Analysis

### A.   Withdrawal Liability

Plaintiffs are trustees of the Sheet Metal Workers Local 22 Pension, Welfare, Annuity, Education, Training and Industry Funds and the fund itself (collectively, the "Funds").  The Funds are an "employee benefit plan" pursuant to Section 3(21)(A) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(21)(A).  Congress enacted ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984).  The Funds are also a multiemployer pension plan under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 et seq.  Congress enacted the MPPAA "out of concern that multiemployer pension plans would collapse as employers withdrew if the remaining contributors became too few in number to pay the unfunded vested benefits." Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 139 (3d Cir. 1997).  Because ERISA and the MPPAA are both "remedial statutes,

they should be liberally construed in favor of protecting the participants in employee benefit plans."

IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986).

By way of background, "[a]n employer withdraws from a multiemployer pension plan when the employer either   permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). The employer is liable for its share of the plan's unfunded vested benefits as calculated at the time of withdrawal." Galgay, 105 F.3d at 139.   When an employer fails to make such payments within the prescribed time, "an action may be brought in federal or state court to compel payment. 29 U.S.C. § 1451(b) & (c). The plan sponsor need show only that it made a demand for interim payments under 29 U.S.C. § 1382 and that the payments were not made." Id.

29 U.S.C. § 1301(b)(1) provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b). Section 1301(b) "makes companies under common control jointly and severally liable for one another's debts." United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & Mc Donnell, Inc., 787 F.2d 128, 132 n. 2 (3d Cir. 1986), abrogated in part by, Concrete Pipe & Prods, of Cal, Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602 (1993).

Count Five of Plaintiffs' Complaint alleges that when Valairco withdrew from the Plan, it incurred withdrawal liability and that Richard and Katherine Valenti have incurred said withdrawal liability by virtue of being members of Valairco's common control group. (Compl., ¶ 167). The Valenti Defendants do not dispute that Valairco withdrew from the Plan, that withdrawal liability payment was demanded, or that Valairco failed to comply with the demand.  In particular, it is

8

undisputed that: (a) during Valairco's 2005 bankruptcy proceeding, the Funds sought payment from Valairco for withdrawal liability in the amount of $393,136.44 (Fischbach Aff., ¶¶ 24, 25), (b) Valairco failed to arbitrate the issue of outstanding withdrawal liability within sixty days of receiving notice of the demand for same, thereby waiving its right to contest the amount of such liability,[3] (c) except for pro-rata amounts paid to the Funds pursuant to the Confirmed Fifth Amended Plan of Reorganization,[4] no further withdrawal liability payments have been made to the Funds (Fischback Aff., ¶¶ 32, 33), and (d) withdrawal liability in the amount of $363,564.52 remains outstanding. (Id.). Thus, the only issue remaining before the Court is whether Richard and Katherine Valenti are members of Valairco's "common control group" such that Valairco's withdrawal liability attaches to the Valenti Defendants personally.

As previously stated, 29 U.S.C. § 1301(b)(1) provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." Companies which are deemed "under common control" are "jointly and severally liable for one another's debts." Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc., 862 F.2d 1020, 1024 (3d Cir.

---

[3] See 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after . . . the date of notification to the employer under section 1399(b)(2)(B)"); 29 U.S.C. § 1401(b)(1) ("If no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor. The plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection.").

[4] These amounts include: (1) $71,405.00 on an arrearage priority claim, (2) $71,529.69 on an arrearage general unsecured contribution claim, and (3) $28,571.82 on a general unsecured withdrawal liability claim. (Pl. 56.1 Stmt., ¶ 48).

1988).  In the same vein, the Third Circuit has recognized that "Congress explicitly provided for individual liability of employers who operate as sole proprietors in 29 U.S.C. § 1405(c)." Id. (holding sole proprietor jointly and severally liable for outstanding withdrawal liability of his company and noting that "the proprietor's personal assets and the proprietorship's business assets are legally a single financial estate").  Although ERISA does not define "trades or businesses" "under common control," it instructs that said terms be interpreted with similar regulations propounded by the Internal Revenue Service.  See 26 C.F.R. §§ 1.414(c)-2(b)(2)(i)(C) ("controlling interest") and 1.414(c)-2(c)(2)(iii) ("effective control").   Thus, trades or businesses may be considered under common control if they constitute a "brother-sister group:"

> The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)-4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

26 C.F.R. §§ 1.414(c)-2(b)(2)(i)(C); see generally Central States, Southeast and Southwest Areas Pension Fund v. Creative Development Co., 232 F.3d 406, 418 -419 (5th Cir. 2000) ("[T]o recover for withdrawal liability under MPPAA, an ERISA multiemployer pension plan need not prove that one who, with others, owns a 'controlling interest' in, and exercises 'effective control' over, a partnership that is one organization in a purported controlled group of trades or businesses, actually satisfies all of the state law requirements to be a partner in such partnership. Rather, all that MPPAA

and its implementing regulations require is that such person own the requisite percentage of a 'profits interest' or a 'capital interest' in that partnership.").

It is undisputed that from approximately 1982 through 2006, Valairco maintained its principal place of business at 29 King George Road in Green Brook, NJ.  (Pl. 56.1 Stmt., ¶ 16).  It is also undisputed that Valairco leased this business space from Richard and Katherine Valenti for a period of time.  (Pl. 56.1 Stmt., ¶ 53).  It is likewise undisputed that Richard Valenti is the sole shareholder of Valairco and was, at the very least, co-proprietor of his leasing business.  Richard Valenti's leasing business and Valairco are deemed under "common control" because five or fewer people owned a controlling interest in each business and exercised effective control over both.[5]  See 29 C.F.R. § 1.414(c)-2(c)(1) (treasury regulations defining two or more trades or businesses under common control).  As a result, Richard Valenti's leasing business, and hence Mr. Valenti himself, must assume Valairco's withdrawal liability.   See, e.g., Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Steinberg, 32 F.3d 269, 271 (7th Cir. 1994).

Plaintiffs argue that Valairco's withdrawal liability should also attach to Katherine Valenti in her capacity as a member of the common control group.  "It is well settled that the MPPAA

---

[5] Courts have found common control group liability where property owned by the sole proprietor is used by or leased by the entity under common control. See, e.g., Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Steinberg, 32 F.3d 269, 270 (7th Cir. 1994) ("Mr. Steinberg, however, was also the title holder of two pieces of real estate that he had leased – as a sole proprietor – to Tasemkin. These leases rendered his sole proprietorship part of a group under 'common control' for purposes of 29 U.S.C. § 1301(b)(1)."); Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1374 (7th Cir. 1992) (finding sole shareholder under common control with corporation due to his leasing of buildings to the corporation, thereby subjecting shareholder to the corporation's withdrawal liability); Pension Ben. Guar. Corp. v. Center City Motors, Inc., 609 F. Supp. 409, 412 (S.D. Cal. 1984) (finding that "Congress did not intend to exclude from its definition of a "trade or business" in § 1301, a rental proprietorship which leases property, under a net lease, to an entity that is under common control.").

11

contemplates recovery of withdrawal liability from partners and partnerships under common control with defaulting signatory employers." Connors v. Ryan's Coal Co., Inc., 923 F.2d 1461, 1467– 1468 (11th Cir. 1991). Thus, the question is whether Katherine Valenti was a "partner" in Valairco's operation.[6] "Co-ownership of a property without more does not create a partnership." Id. Rather, "the true focus of the inquiry must be on whether the alleged partners really and truly intended to join together in the present conduct of the enterprise. Their intention in this respect is a question of fact, and may be determined with reference to an express agreement or from the circumstances surrounding the purported partnership arrangement." Id.

Although there is no evidence that Richard and Katherine Valenti entered into an express partnership agreement, the undisputed circumstantial evidence submitted by Plaintiffs sufficiently demonstrates that Katherine and Richard Valenti carried on the requisite "degree of business activity" to be considered partners. See id. For instance, Valairco made its lease payments for use of the Green Brook property to Richard and Katherine Valenti. (Pl. 56.1 Stmt., ¶ 54). Pursuant to the 1996 Agreement, Richard and Katherine Valenti jointly contributed the Green Brook property to Valairco as a capital contribution. (Id., ¶ 56). The 1996 Agreement provides that such a transfer was intended to increase the net worth of Valairco and decrease its monthly rental expenses. (Id., ¶ 57). In addition, in 1994, Katherine Valenti was a signatory to a corporate and personal loan taken by Valairco through Midlantic Bank. (Underwood Cert., Ex. P, Tr. (Richard Valenti) at 15:10-14). Katherine Valenti executed the 1996 Agreement as director of Valairco. (Id. at 16:15-24). Katherine Valenti's personal checks were kept at the Valairco office and were written for corporate obligations

---

[6] "The question whether a business relationship qualifies as a partnership is ultimately one of federal law." Connors, 923 F.2d at 1467-1468.

by Valairco's bookkeeper. (Underwood Cert., Ex. Q, Tr. (Muhlahn) at 63:6-64:5; 67:23-69:7).  Such

evidence demonstrates a nexus between Valairco's day-to-day operations and Katherine Valenti's

co-ownership of the Green Brook property that would lead a reasonable person to believe that she

was a partner or joint venturer in the Valairco business.  Thus, the Court finds Katherine Valenti

jointly and severally liable for Valairco's withdrawal liability based upon her partnership interest in

Valairco. See, e.g., Connors, 923 F.2d at 1467-1468 ("We recognize that co-ownership of property

without more does not create a partnership. However, the co-ownership of business property along

with the sharing of business profits and losses and George Simmons' well documented practice of

including family members in his business operations, indicate that the co-owners of the cattle farm

carried on the requisite 'degree of business activity' to be considered partners under federal and state

law.").  Plaintiff's motion for summary judgment as to this claim is, therefore, granted.  Richard

Valenti and Katherine Valenti shall be personally and jointly and severally liable for the deficiency

amounts due and owing as to the pension plan withdrawal liability claim, plus applicable penalties,

interest, attorneys' fees and costs – if any.  Plaintiffs may seek approval for same under separate

application.

## B.    Contribution Deficiencies

Plaintiffs seek to recover Valairco's contribution deficiencies from Richard and Katherine

Valenti personally by piercing Valairco's corporate veil.[7]  In particular, Count One of Plaintiffs'

---

[7] Plaintiffs also seek to recover Valairco's withdrawal liability from the Valenti Defendants
based on the same theory.  Having already found Richard and Katherine Valenti personally and
jointly and severally liable for Valairco's withdrawal liability by virtue of the fact that they were
members of a common control group with Valairco, the Court will focus its analysis on whether the
"piercing the corporate veil" doctrine allows Plaintiffs to hold the Valenti Defendants liable for
Valairco's contribution deficiencies.

Second Amended Complaint alleges that Valairco was Richard Valenti's "alter ego" inasmuch as "the private finances of [Richard Valenti] and the finances of Valairco, were essentially conducted as a single entity involving extensive commingling of corporate and personal funds." (Compl., ¶ 118). The same allegations are made against Katherine Valenti in Count Two. (Compl., ¶ 124).

Generally speaking, a shareholder is not personally liable for the corporation's obligations. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994). "The corporate veil is pierced only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.' " Id. Thus, "in deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder." Id. In order to state a claim for piercing the corporate veil under New Jersey law,[8] a plaintiff must show that: "(1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002). The Court of Appeals for the Third Circuit has recognized certain events that permit the corporate veil to be pierced. Such events include:

> Failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the

---

[8] It is undisputed that New Jersey law applies to Plaintiffs' state law claims.

dominant stockholder or stockholders.

Kaplan, 19 F. 3d at 1521 (citing United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981)).  "While 'piercing of the corporate veil is an equitable remedy,' and therefore 'the situation must present an element of injustice or fundamental unfairness, . . . a number of these factors can be sufficient to show such unfairness.' " Trustees of Nat'l Elevator Industry Pension, Health Benefit and Educ. Funds v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003) (quoting Pisani, 646 F.2d at 88).  It should be noted, however, that the Third Circuit's test does not require proof of actual fraud.   Id. Nevertheless, the party seeking to disregard the corporate form must prove by clear and convincing evidence that the corporate veil should be pierced. See Lutyk, 332 F.3d at 192.

As a preliminary matter, Katherine Valenti does not own any shares of stock in Valairco. Certainly, she is not a "dominant stockholder." Nevertheless, Plaintiffs attempt to impose personal liability on her for Valairco's contribution deficiencies based on an alter ego/piercing the corporate veil theory.   Plaintiffs fail to demonstrate how personal liability may be imposed on Katherine Valenti – who owned no stock in Valairco – based on such a theory.  The cases cited to by Plaintiffs involve piercing the corporate veil in situations where the liability is sought to be imposed on the corporation's owner.  See, e.g., In re Nutri/System of Florida Assocs., 178 B.R. 645, 653 (E.D. Pa. 1995) ("In order for the corporate veil to be pierced, a plaintiff must first make a threshold showing of control of the corporation that the plaintiff seeks to pierce, which is more than mere majority or complete stock control, but is complete domination").  Plaintiffs concede that Richard Valenti was the sole shareholder of Valairco and that, at most, Katherine Valenti served as an employee of the company.  See Pl. 56.1 Stmt., ¶¶ 12, 13, 120, 121, 139; Pl. Br. at 23.[9]  Based on the theory presented,

---

[9] See also Underwood Cert., Ex. Q, Muhlhahn Dep. Tr. at 24:14-16.

Plaintiffs have given the Court no basis on which to impose personal liability on Katherine Valenti for Valairco's contribution deficiencies.  Accordingly, to the extent Plaintiffs' motion seeks to impose personal liability on Katherine Valenti for Valairco's contribution deficiencies based on an alter ego/piercing the corporate veil theory, Plaintiffs' motion is denied.

As to Richard Valenti, the Court finds ample evidence to support piercing the corporate veil. In particular, based on the reasons that follow, the Court finds that the following factors all weigh in favor of piercing the corporate veil: (1) Valairco's gross undercapitalization, (2) Valairco's failure to observe corporate formalities, (3) Valairco's insolvency, and (4) the siphoning of Valairco's funds by Richard Valenti.

Valairco's two bankruptcies (in 1980 and 1996) demonstrate an overarching pattern of undercapitalization, as well as the insolvency of the debtor corporation.  In addition, the 1996 Agreement ("Unanimous Consent of the Sole Shareholder and the Board of Directors of Valairco, Inc.")  was admittedly entered into between Valairco and Richard Valenti (acting as sole shareholder of Valairco) in order to improve problems concerning Valairco's "cash flow" and "profitability." (Underwood Cert., Ex. D). The 1996 Agreement states, in pertinent part, that Valairco "continues to have a negative net worth and this negative net worth has created significant concerns from various creditors and lenders about the Company's profitability and ability to continue operations, including the issuances of going concern opinion by the Company's auditors in connection with the Company's October 31, 1995 financial statement." Id.   Valairco's undercapitalization is further evidenced by the Summary of Debtor's Bankruptcy Schedules which lists Valairco's assets, during the relevant time period, as $1,084,886.53 and its liabilities as $2,542,564.06. (Underwood Cert., Ex. L).

16

Evidence contained in the record also demonstrates that Valairco failed to observe certain corporate formalities. For instance, Valairco's bookkeeper, Sandra Muhlhahn, testified that she was not aware of Valairco ever having had a corporate board or officer meeting. (Underwood Cert., Ex. Q, Muhlahahn Tr. at 19:11-13). She also testified that, as of the date of her deposition, Valairco had only one director – its president, Richard Valenti. (Id. at 18:9-14). She also testified that she was unaware of Valairco ever having paid corporate dividends to its shareholders or directors. (Id. at 120:17-20). Richard Valenti also admitted that, during the relevant time period, Valairco did not generate any board of director meeting minutes, any shareholder meeting minutes or any corporate resolutions. (Richard Valenti Answer, ¶¶ 92-94). The Court notes that Richard Valenti has failed to come forward with proof that any such corporate records have ever existed. Also confirming the lack of corporate formalities is the nonfunctioning of Valairco's officers and directors. For instance, Katherine Valenti, who admitted to serving as Secretary and Treasurer of Valairco until November 2006, denied any inference that she was involved in the day to day operations of Valairco (Katherine Valenti Answer, ¶ 52) or had any decision-making authority (Def. Opp'n at 4).

Evidence contained in the record also demonstrates the siphoning of Valairco's funds by Richard Valenti. For instance, Richard Valenti admitted that he failed to remit corporate funds to Valairco's employees' 401(k) plans and that he was charged with theft by retention by the Somerset County Prosecutor for such actions. (Richard Valenti Answer, ¶ 77). Additionally, although the Green Brook property was owned by Richard and Katherine Valenti between 1983 and December 2006 (Richard Valenti Answer, ¶ 50), Richard Valenti admitted that from 1996 through 2005 Valairco paid all insurance costs, property taxes, secured mortgage debt related to, carry charges related to and all other expenses incurred by the Green Brook property (Richard Valenti Answer, ¶¶

17

58-62). In the same vein, although such property was owned by the Valenti Defendants between 1996 and 2005, Richard Valenti admitted that during such time, Valairco characterized the Green Brook property as an asset on its state and federal tax returns and depreciated same. (Richard Valenti Answer, ¶ 74). Moreover, Richard Valenti admitted that all such payments made by Valairco for property owned by the Valenti Defendants was not disclosed as income on their personal income tax returns. (Richard Valenti Answer, ¶ 97). Mortgage payments on the Valenti's home in Summit, NJ were also paid by Valairco. (Underwood Cert., Ex. H, Richard Valenti Dep. Tr. at 66:13-23).

In light of the foregoing, the Court finds that Plaintiffs have met their burden of demonstrating by clear and convincing evidence that a fundamental injustice would occur if Richard Valenti were not held responsible for Valairco's contribution deficiencies. The Court, therefore, grants Plaintiffs' request to pierce Valairco's corporate veil so as to hold Richard Valenti personally liable for Valairco's contribution deficiencies. Richard Valenti shall be personally liable for the deficiency amounts due and owing as to the benefit contribution claim, plus applicable penalties, interest, attorneys' fees and costs – if any. Plaintiffs may seek approval for same under separate application.

### C.    Fraudulent Transfers

Plaintiffs argue that certain transfers of real property by Richard Valenti to Katherine Valenti in December 2006 were fraudulent pursuant to New Jersey's Uniform Fraudulent Transfer Act, N.J.S.A. 25:2-25, inasmuch as such transfers were made: (1) with actual intent to hinder, delay or defraud the Plaintiffs,[10] and/or (2) without the exchange of reasonable consideration.

The transfers at issue occurred in 2006 and were made by way of a Real Estate Transfer

---

[10] It is undisputed that Plaintiffs are creditors of both Valairco and Richard Valenti.

Agreement ("RETA").  Pursuant to the 2006 RETA, Richard Valenti's title and interest in real

properties located in the following were transferred to his wife, Katherine Valenti: (1) Summit, NJ,

(2) Manville, NJ, and (3) Blooming Grove, PA. The 2006 RETA provides that such transfers were

made "for good and valuable consideration." (Underwood Cert., Ex. M).  The 2006 RETA also

provides that Katherine Valenti would contribute her interest in a property located in Green Brook,

NJ to Richard Valenti so as to allow Richard Valenti to sell such property in order to fund Valairco's

Chapter 11 Plan. (Id.).   The deeds attached to the 2006 RETA reflect that consideration in the

amount of $10.00 was given for the transfer of each of the properties at issue.  (Underwood Cert.,

Ex. M).

The Uniform Fraudulent Transfer Act ("UFTA"), N.J.S.A. 25:2-20 et seq, governs Plaintiffs'

fraudulent conveyance claim. See Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 732

(1999).  The UFTA provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to
> a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor made
> the transfer or incurred the obligation:
>
> a.      With actual intent to hinder, delay, or defraud any creditor of
>         the debtor; or
> b.      Without receiving a reasonably equivalent value in exchange
>         for the transfer or obligation, and the debtor:
>
> (1)     Was engaged or was about to engage in a business or a
>         transaction for which the remaining assets of the debtor were
>         unreasonably small in relation to the business or transaction;
>         or
>
> (2)     intended to incur, or believed or reasonably should have
>         believed that the debtor would incur, debts beyond the
>         debtor's ability to pay as they become due.

N.J.S.A. 25:2-25.  "The purpose of the [UFTA] is to prevent a debtor from placing his or her property beyond a creditor's reach . . . [in order to] allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection." Gilchinsky, 159 N.J. at 475. Thus, there are two questions that must be answered in evaluating a claim under the UFTA: (1) "whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance," and (2) "whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor." Id. at 475-76 (alteration in original; internal quotations omitted).  The Valenti Defendants do not dispute that the three properties at issue may have been available to creditors of Valairco and/or Richard Valenti prior to the 2006 transfers or that the 2006 transfers put said properties beyond their reach.  See id.  Accordingly, the Court will focus its analysis on whether Plaintiffs have met their burden in demonstrating the requisite intent to defraud.

To determine whether there was an actual intent to defraud, courts are to consider what are known as the "badges of fraud."  These "badges" are found in N.J.S.A. 25:2-26. The considerations for a court under the badges of fraud are whether:

a. The transfer or obligation was to an insider;
b. The debtor retained possession or control of the property transferred after the transfer;
c. The transfer or obligation was disclosed or concealed;
d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
e. The transfer was of substantially all the debtor's assets;
f. The debtor absconded;
g. The debtor removed or concealed assets;
h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
i. The debtor was insolvent or became insolvent shortly after the

20

transfer was made or the obligation was incurred;

j.      The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k.      The debtor transferred the essential assets of the business to a lien or who transferred the assets to an insider of the debtor.

N.J.S.A. 25:2-26. A finding by a court of one badge can "cast suspicion on the transferor's intent." Gilchinsky, 159 N.J. at 477. A finding of "several in one transaction generally provides conclusive evidence of an actual intent to defraud." Id.

Here, several badges of fraud are present. First, each of the transfers in question were made to an insider. An "insider," as defined in N.J.S.A. §25:2-22(a), includes a relative of a debtor, so long as that debtor is an individual. Here, the first transfer was made from Richard Valenti to his wife Katherine Valenti.

Second, it is evident that Richard Valenti maintained possession of and control over the foregoing properties given that: (a) the parties are married, and (b) pursuant to the 2006 RETA, Katherine Valenti would lease at least one of the properties at issue (Manville) back to Valairco. (Underwood Cert., Ex M).

Third, Richard Valenti had been threatened with suit prior to the date of such transfers. In particular, by way of correspondence dated September 19, 2006, Plaintiffs' counsel put the Valenti Defendants and Valairco on notice of the Funds' intention to pursue Richard Valenti personally for Valairco's pension and benefit deficiencies. (Underwood Cert., Ex. J). The 2006 RETA transferring Richard Valenti's interest in the three properties at issue was executed approximately three months later – on December 5, 2006. (Underwood Cert., Ex. M).

Lastly, the Court notes that there appears to be a lack of reasonable consideration for the transfers at issue. For instance, the RETA provides that consideration in the amount of $10.00 per

property was given.  Moreover, although the 2006 RETA purported to transfer Katherine Valenti's interest in the Green Brook property to Richard Valenti in return for the transfers at issue, all parties to this motion agree that, pursuant to the 1996 Agreement, the Green Brook property had already been conveyed by the Valenti Defendants to Valairco.  Compare Pl. 56.1 Stmt., ¶ 56 ("The 1996 Agreement states that RJV and KPV contributed the [Green Brook property] to Valairco as a capital contribution, subject to a certain mortgage on same with Midlantic Bank.") with Def. Opp'n Br. at 2 ("In 1996, an agreement was entered into to transfer ownership of the property at 29 King George Rd., Green Brook, NJ from Richard J. And Katherine P. Valenti to Valairco, Inc. In order to increase the value of Valairco.").[11]  Notwithstanding the foregoing, the Court will not base its decision on the lack of reasonable consideration inasmuch as evidence contained in the record indicates an implicit finding by the Bankruptcy Court that the Valenti's interest in the Green Brook property had not been transferred to Valairco in 1996. See Underwood Cert., Ex. B at 18.

Given that several badges of fraud have been satisfied and that there are no questions of material fact in dispute, the Court finds that the 2006 transfers made by Richard Valenti of his interest in the properties located in Summit, NJ, Manville, NJ, and Blooming Grove, PA to his wife, Katherine Valenti, were fraudulent pursuant to N.J.S.A. 25:2-25.  Accordingly, Plaintiffs' motion for summary judgment as to this claim is granted.

Lastly, the Court notes that New Jersey's Uniform Fraudulent Transfer Act permits several

---

[11] Although Katherine Valenti raises no defenses in connection with this claim, the Court notes that a transferee may have a complete defense for a claim of fraudulent conveyance by showing that: (a) that person took the property in good faith, and (b) sufficient consideration for the transfer was given.  N.J.S.A. § 25:2-30(a).  There is no evidence before the Court suggesting that Katherine Valenti took the properties at issue in good faith.  Thus, no such defense would be available to Katherine Valenti.

forms of relief.  For instance, the creditor can seek: (a) to avoid the transfer of the property to the extent necessary to satisfy the creditor's claim, N.J.S.A. 25:2-29(a)(1), or (b) an attachment against the asset transferred, N.J.S.A. 25:2-29(a)(2).  Plaintiffs have asked the Court to avoid the December 2006 transfers pursuant to N.J.S.A. 25:2-29(a)(1). Although such relief may ultimately be available to the Plaintiffs, the specific amounts due and owing as to Plaintiffs' withdrawal liability and contribution deficiency claims has yet to be determined.  In addition, there is insufficient evidence before the Court that the Valentis are otherwise insolvent.  Therefore, based upon the current record, the Court is not in a position to determine whether avoidance of the 2006 transfers is "necessary to satisfy [Plaintiffs'] claim." N.J.S.A. 25:2-29(a)(1).  Accordingly, Plaintiffs' request for avoidance of the 2006 transfers is denied without prejudice.

## **CONCLUSION**

Plaintiff's motion for summary judgment as to its withdrawal liability claim is granted. Having found Richard and Katherine Valenti members of a common control group with Valairco, they shall each be personally and jointly and severally liable for the deficiency amounts due and owing as to the pension plan withdrawal liability claim, plus applicable penalties, interest, attorneys' fees and costs – if any.  Plaintiffs may seek approval for same under separate application.

Plaintiffs' request to pierce Valairco's corporate veil so as to hold Richard Valenti personally liable for Valairco's contribution deficiencies is also granted.  Richard Valenti shall be personally liable for the deficiency amounts due and owing as to the benefit contribution claim, plus applicable penalties, interest, attorneys' fees and costs – if any.  Plaintiffs may seek approval for same under separate application.

Finally, the Court finds that the 2006 transfers made by Richard Valenti of his interest in the

properties located in Summit, NJ, Manville, NJ, and Blooming Grove, PA to his wife, Katherine Valenti, were fraudulent pursuant to N.J.S.A. 25:2-25.  Accordingly, Plaintiffs' motion for summary judgment as to its claim of fraudulent conveyance against the Valenti Defendants is granted. Plaintiffs' request to avoid such transfers is denied without prejudice.

An appropriate Order accompanies this Opinion.


Date:   August 30, 2010                                    /s/ Jose L. Linares
                                                           Jose L. Linares
                                                           United States District Judge

24